AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.   23mj2630
)
**Black Samsung Cell Phone** )
**Seized as FP&F No. 2023565600004303** )
**("Target Device 1")** )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the    Southern    District of    California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Stephen Mejia, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Stephen Mejia Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*

Date:    07/27/2023

*Judge's signature*

City and state: San Diego, California     HON. David D. Leshner U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Stephen Mejia, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrants to search the following electronic devices:

> Black Samsung Cell Phone
> Seized as FP&F No. 2023565600004303
> (**"Target Device 1"**)
>
> Black Samsung Cell Phone With Purple Case
> Seized as FP&F No. 2023565600004304
> (**"Target Device 2"**)

Collectively the (**"Target Devices"**), as further described in Attachment A-1 and A-2, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (a)(I)(A)(ii), Transportation of Illegal Aliens, as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Jesus Enrique Jr. MELENDEZ-Partida and Georgette Christine ZARAGOZA for transportation of illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

1

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2019 and am currently assigned to the Boulevard Border Patrol Station Abatement Team. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.   The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

3

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

e. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**FACTS SUPPORTING PROBABLE CAUSE**

11. On June 11th, 2023, Border Patrol Agent (BPA) S. Mejia, a member of the Boulevard Border Patrol Station's Abatement Team, was conducting anti-smuggling operations in and around Jacumba, California located in the Boulevard Border Patrol Station's area of responsibility. BPA Mejia was wearing a full rough duty uniform with a badge and insignia visible. BPA Mejia was driving a marked Border Patrol vehicle with fully functioning emergency lights and sirens.

12. Interstate 8 (I-8) and Old Highway 80 (OH-80) are two highways that run parallel to, and are within close proximity to the United States/Mexico International Boundary. These two roads run through the Boulevard area, and in some places OH-80 comes as close as to within 50 yards to the border. Due in part to these factors, Jacumba, along with I-8 and OH-80, are known corridors for illegal alien and drug smuggling activity from Mexico into the United States. The Boulevard area is located in a very remote area with houses spread sporadically throughout. The area is mountainous and filled with valleys, washes, and boulders. Most of the vehicle traffic on I-8 is attributed to travelers traversing the area, as this is the most expeditious and convenient route between San Diego, California and points east. In contrast, most of the traffic on OH-80 can be attributed to residents coming to and going from the Boulevard area. The Boulevard area consists of two small towns: the town of Jacumba with an approximate population of 600, and the town of Boulevard, with an approximate population of 500. The area along the roads and throughout the towns of Jacumba and Boulevard are filled with thick dense brush, low valleys, and high boulders that create blind spots for agents performing surveillance duties from elevated vantage points. This terrain provides many hiding places for undocumented

5

non-citizens waiting to be picked up alongside the roadways. In addition to the terrain features, there are numerous abandoned structures in this area that provide ample hiding places for undocumented non-citizens after they make illegal entry into the United States. Due to its proximity to the United States/Mexico International Boundary and the easy access to major freeways, illegal drug and illegal alien smugglers favor this area to cross their illicit cargo and move it further into the United States.

13. At approximately 3:10 p.m., BPA Mejia was parked, in the town of Jacumba, monitoring vehicular traffic for potential alien smugglers. At this time, BPA Mejia observed a gray Toyota Tacoma, driving eastbound, past his location. BPA Mejia then requested records checks, which revealed that it was registered out of Rialto, California, which is over 150 miles away from Jacumba. The Tacoma continued travelling eastbound through Jacumba, without making any visible stops. At 3:50 p.m., while parked at the same location, BPA Mejia observed the same Tacoma driving westbound on OH-80 toward his location. BPA Mejia contacted Border Patrol Agent A. Velasquez, who was operating a Mobile Surveillance Capabilities (MSC) scope, and asked him to try and maintain a visual on the Tacoma. BPA Velasquez then notified BPA Mejia, via service radio, that the Tacoma was now traveling westbound on OH-80 towards Jacumba. BPA Mejia then observed the Tacoma pull over on the south side of OH-80 and into the Jacumba Library parking lot. The Tacoma was the only vehicle in the parking lot of the library, and it should be noted that the library was closed at the time. At approximately 3:50 p.m., the driver of the Tacoma stopped by the restrooms of the parking lot, southeast of the library. The driver was stopped there for approximately five minutes before it moved again and relocated back closer to the library.

14. At the same time, Border Patrol Agent K. Massie was parked near an area known to Border Patrol Agents as "Mercado Rock". BPA Massie was using binoculars to observe the area south of Jacumba for illegal aliens crossing the United States/Mexico International Boundary fence. BPA Massie then obtained a visual of the Tacoma as it was

parked in the Jacumba Library parking lot. BPA Mejia notified BPA Massie, via service radio, that he would be leaving the area and asked her to continue monitoring the Tacoma. At approximately 3:56 p.m., agents in the field were notified if a citizen's report of two individuals observed running northbound, towards the Jacumba Library. Shortly after, BPA Massie observed the two individuals running towards the Tacoma. BPA Massie relayed her observations and stated that one of the individuals was waving their hands, appearing to signal to the Tacoma to stop. BPA Massie advised that it appeared one of the individuals was trying to hoist themselves up, into the bed of the Tacoma. BPA Massie then observed the gray Toyota Tacoma stop and accelerate multiple times along the south side of OH-80, while appearing to try and let both individuals get into the bed of the truck. BPA Massie temporarily lost visual of the Tacoma, but when she regained visual, she relayed that the Tacoma was now traveling westbound on OH-80, and went out of view.

15.   At this time, United States Army National Guard personnel that were located near an known to Border Patrol Agents as "Jacumba Peak", were observing the border area with binoculars. At approximately 3:59 p.m., the National Guard notified agents in the field, that they observed two individuals get into the Tacoma. BPA Mejia suspected that the vehicle had picked up illegal aleins near the border.

16.   As the Tacoma left Jacumba going westbound, K9 Border Patrol Agent A. Luzak, was stationed along the shoulder of OH-80 at a dirt road known to Border Patrol Agents as "Gordon's Driveway". BPA Luzak was wearing a full rough duty uniform and was operating an unmarked Ford F-150 agency vehicle, equipped with fully functioning emergency lights and sirens. This location is approximately one mile west of the town of Jacumba and provides a clear view of OH-80 travel in both directions. BPA Luzak relayed, via service radio, that he observed the gray Tacoma pass his location and began to try and catch up. BPA Luzak estimated the Tacoma's speed to be approximately 50 miles per hour. As BPA Luzak began to get closer to the Tacoma, he lost visual of it for approximately five seconds while navigating a turn, and when BPA Luzak emerged from the turn, he

observed two individuals, laying on the ground on the shoulder of OH-80. This area is located approximately 24.5 miles east of the Tecate, California Port of Entry and approximately one mile north of the United States/Mexico International Boundary. BPA Luzak also observed that the Tacoma was continuing westbound at roughly the same speed as when it had initially passed him. This surprised BPA Luzak because he did not feel that they would have had time to come to a complete stop and get back up to speed in the amount of time that he had lost visual. BPA Luzak immediately saw that one of the subjects appeared to be injured and reported his observations via service radio. Because of their location on the shoulder of the road, and the fact that they were wearing carpet tied to their shoes, known to Border Patrol Agents as "booties", BPA Luzak suspected that these two individuals were the same individuals that had been observed getting into the gray Toyota Tacoma minutes earlier. BPA Luzak further suspected that these subjects must have jumped from, or been pushed from, the moving vehicle, based on its current speed.

17. As BPA Luzak began to render aid, Border Patrol Agent S. Candelario arrived on scene and assisted BPA Luzak with the two individuals, later identified as Guatemalan citizens I.Q.S. and B.B.S. As he tended to I.Q.S.'s injuries, BPA Candelario asked B.B.S, if she saw what had happened to I.Q.S. B.B.S. stated that the driver, later identified as the defendant Enrique Jr. MELENDEZ-Partida, and the front seat passenger, later identified as the defendant, Georgette Christine ZARAGOZA, had begun yelling at I.Q.S. and B.B.S. to get out of the vehicle while it was still moving. B.B.S. stated that neither she, nor I.Q.S., wanted to get out of the car while it was moving; but B.B.S. stated that ZARAGOZA reached behind her and opened the rear passenger door and continued yelling at them to jump out of the moving truck. Based on ZARAGOZA's actions and MELENDEZ' words, B.B.S. and I.Q.S. decided to jump out of the vehicle while it was still moving.

18. **Target Device 1** was found on B.B.S.'s person and **Target Device 2** was found on I.Q.S's person, in her waistband during her medical evaluation. B.B.S. claimed

ownership of **Target Device 1**. I.Q.S. was unable to be asked any questions at the scene. Both of these devices were subsequently seized

19. As BPA Luzak relayed the medical situation and requested Emergency Medical Services. The Tacoma was observed passing the location of Border Patrol Agent C. Seal and BPA Mejia, who were located approximately one mile west of BPA Luzak and BPA Candelario's location. BPAs Seal and Mejia quickly caught up to the vehicle and initiated a vehicle stop on the Tacoma at approximately 4:02 p.m. The driver pulled over on the shoulder of OH-80 approximately one mile west of BPA Luzak's location. This area is located approximately 24 miles east of the Tecate, California Port of Entry and approximately two miles north of the United States/Mexico International Boundary. Almost as soon as the vehicles came to a stop, MELENDEZ, exited the Tacoma and began to approach BPA Seal's vehicle. BPA Seal gave MELENDEZ verbal commands to get back into the car and to await further instructions. BPA Seal then approached the driver side of the Tacoma while BPA Mejia approached the passenger side of the vehicle. BPA Mejia opened the passenger-side door and asked ZARAGOZA to step out of the vehicle. As she was exiting, ZARAGOZA stated, in English, that "they just jumped in the vehicle", which BPA Mejia took to be referring to the two subjects found in the road just moments earlier. BPA Mejia then placed ZARAGOZA in handcuffs and placed her in the back seat of his marked agency vehicle. Meanwhile, BPA Seal removed MELENDEZ from the Tacoma, applied handcuffs, and placed him in the back seat of his marked vehicle. BPA Mejia asked ZARAGOZA to state her citizenship, and she replied that she is a United States Citizen. BPA Mejia then walked over to BPA Seal's vehicle and asked MELENDEZ what his citizenship is, and MELENDEZ stated, "United States". At approximately 4:05 PM, BPA Mejia verbally advised both MELENDEZ and ZARAGOZA that they were being detained for suspicion of Alien Smuggling. Due to there being a high volume of radio traffic for fire and emergency medical services being coordinated and requested for I.Q.S. and B.B.S.,

BPA Mejia did not advise via service radio that MELENDEZ and ZARAGOZA were under arrest for suspicion of Alien Smuggling until approximately 4:21 PM.

20. Following the arrest of MELENDEZ and ZARAGOZA, BPA Mejia performed a search of the Tacoma. BPA Mejia located an iPhone with a yellow phone case in the front driver door compartment, which MELENDEZ claimed ownership of. BPA Mejia also located another black iPhone with no phone case on it, on the front passenger seat. MELENDEZ at first claimed that this phone belonged to a friend who let him borrow it, but shortly after MELENDEZ claimed ownership of it. BPA Mejia also located another black iPhone, in a tan purse in the Tacoma. ZARAGOZA claimed ownership of this purse and the phone. BPA Mejia also noticed pieces of brush in the back passenger seats and along the back floorboards of the Gray Toyota Tacoma, indicating to him that I.Q.S. and B.B.S. had likely been in the back seat. It is common for dirt and brush to be captured in the "booties" worn by smuggled individuals which is easily transferred to other materials such as the interior of a vehicle. BPA Mejia also noticed a large water bottle on the back floorboard area.

21. As BPA Luzak and Candelario continued to coordinate medical care and transport for I.Q.S. on OH-80, MELENDEZ, ZARAGOZA, and B.B.S. were transported to the Boulevard Border Patrol Station for further processing. At the Boulevard Border Patrol Station, biographic and biometric information was taken from each individual and entered into DHS processing systems. At approximately 4:45 PM, Border Patrol Agent E. Penuelas, who was assigned to processing at the Boulevard Border Patrol station, conducted an immigration inspection on B.B.S. B.B.S. stated that she is a citizen of Guatemala without any immigration documents allowing her to enter or remain in the United States legally. At approximately 4:45 PM, BPA Penuelas informed B.B.S. that she was under arrest.

22. I.Q.S. was transported to Sharp Memorial Hospital in San Diego, due to receiving brain trauma from being forced out of MELENDEZ's Tacoma. On July 4, 2023

10

at approximately 7:49 PM BPA Mejia conducted an immigration inspection on I.Q.S. I.Q.S. stated that she is a citizen of Guatemala without any immigration documents allowing her to enter or remain in the United States legally. At approximately 7:51 PM BPA Mejia placed I.Q.S. under arrest.

23. It should be noted that this affidavit is for B.B.S. and I.Q.S.'s cellular phones, the material witnesses in this case. Separate affidavits will be submitted at a later date for MELENDEZ and ZARAGOZA's cellular phones, the defendant's in this case.

24. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that B.B.S. and I.Q.S. were using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **May 11, 2023, through June 11, 2023.**

## METHODOLOGY

25. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their

subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

27. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

28. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

29. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

30. Because the **Target Devices** were seized at the time of B.B.S. and I.Q.S' arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **May 11, 2023 through June 11, 2023**.

31. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item(s) described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Stephen Mejia
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of July, 2023.

Hon. David D. Leshner
United States Magistrate Judge

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Samsung Cell Phone
Seized as FP&F No. 2023565600004303
("**Target Device 1**")

**Target Device** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1 and A-2 and includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **May 11, 2023 through June 11, 2023**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.